

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
12/20/2019

| | | |
|---|---|---|
| IN RE:<br>**ULTRA PETROLEUM CORP.,** *et al*<br>    **Debtor(s)** | §<br>§<br>§<br>§<br>§ | **CASE NO: 16-32202**<br><br>**CHAPTER  11** |
| **JONAH LLC,** *et al*<br>    **Plaintiff(s)**<br><br>**VS.**<br><br>**ULTRA PETROLEUM CORP.,** *et al*<br>    **Defendant(s)** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | <br><br>**ADVERSARY NO. 16-03278** |

## <u>MEMORANDUM OPINION</u>

Jonah LLC[1] *et al* owns overriding royalty interests ("ORRIs") carved out of federal oil and gas leases in the Pinedale Field in Sublette County, Wyoming.  Ultra Petroleum Corp.[2] is the operator under the leases.  The other defendants are Ultra affiliates.  The dispute in this adversary proceeding concerns the method of calculation of the payments required to be made by Ultra pursuant to Jonah's ORRIs.

On April 29, 2016, Ultra filed for chapter 11 bankruptcy.  (*See* Case No. 16-32204; ECF No. 1).  On December 19, 2016, Jonah filed this adversary proceeding against Ultra seeking: (i) a determination of the validity and extent of its ORRIs; (ii) payments that Ultra allegedly failed to make, and (iii) a determination that any underpaid ORRIs did not become property of Ultra's bankruptcy estate.  (ECF No. 1 at 17–24).  Both parties filed competing motions for partial

---

[1] The Plaintiffs in this adversary proceeding are Jonah LLC, Weeks Pinedale, LLC, Weeks Resources, LLC, Weeks Oil Properties, LLC, McMurry Limited Liability Company, Bushong Oil & Gas Properties, LLC, and Joseph Scott.

[2] The Defendants in this adversary proceeding are Ultra Petroleum Corporation, Keystone Gas Gathering, LLC, Ultra Resources, Inc., UP Energy Corporation, Ultra Wyoming, Inc., UPL Pinedale, LLC, and UPL Three Rivers Holdings, LLC.

summary judgment. (ECF Nos. 48; 49). On August 24, 2017, the Court denied both summary judgment motions. (ECF No. 71). The Court found that further examination of the agreements was needed to establish whether the gas price is set at the wellhead or at the delivery point. (ECF No. 71 at 10–11).

On November 14, 2018, the Court held a hearing to determine at which point the oil and gas should be valued according to the ORRIs. (ECF No. 134 at 8). At the hearing, Jonah argued that the instruments creating Classes 2, 3, and 4 of its ORRIs, and the instruments creating the farm-out overrides do not allow for deductions and do not have the requisite specific language regarding what costs of production may be deducted from Jonah's ORRI payments. Jonah argued that the absence of specific language requires the application of the Wyoming Royalty Payment Act ("WRPA").[3] (ECF No. 134 at 32). Jonah further argued that although the 2000 Amendment creating Class 5 ORRI allowed for deductions, Ultra was bound by a letter from its predecessor in interest (SWEPI), which altered those deductions. Because of the SWEPI letter, Jonah alleges that Ultra could not take post-production deductions on Jonah's ORRIs. (ECF No. 134 at 215).

Ultra argued that ORRI Classes 2, 3, and 4 were sufficiently specific to be removed from the confines of the relevant WRPA provisions.[4] (ECF No. 134 at 64–65). Alternatively, Ultra asserted that the WRPA cannot be applied retroactively to replace the bargained-for terms of the ORRIs executed decades before the WRPA's enactment. The Court held that based on the market that existed at the time the leases were executed, oil and gas was valued at the wellhead; therefore, wellhead prices were an assumption underlying the contracts for Classes 2, 3, and 4.

---

[3] 28 ORRIs are in dispute in this proceeding. Jonah has classified the 28 ORRIs into 5 classes. For convenience, the Court adopts Jonah's classification. (*See* ECF No. 71).

[4] Ultra objected to argument on both the letter from SWEPI and the farm-out overrides on the basis that they were not included in Jonah's Original Complaint. (ECF No. 134 at 81, 206).

(ECF No. 134 at 338).  At the conclusion of the hearing, the Court requested further briefing on: (i) whether the WRPA can apply retroactively to alter an assumption of the contract, and (ii) the treatment required of a class of overrides not in the complaint but listed as a contested matter in the pretrial order.  (ECF No. 134 at 336–39).

For the reasons set forth below, the Court finds that: (i) the WRPA cannot apply retroactively to Classes 2, 3, and 4; (ii) the WRPA applies to the farm-out overrides; and (iii) Ultra is not bound by the 2004 SWEPI Letter.

## **Background**[5]

Ultra owns working interests in federal oil and gas leases located in the Pinedale Field of Sublette County, Wyoming.  (ECF No. 1 at 5).  These leases stem from fifteen Bureau of Land Management (the "BLM") leases issued between 1950 and 1952.  (ECF Nos.1 at 6; 49 at 9). Jonah owns ORRIs burdening some of Ultra's leases.  (ECF No. 1 at 6).  These ORRIs are defined by 28 separate instruments.  (ECF No. 49 at 10).  Jonah categorizes these instruments into five classes:

i.    Class 1 includes ORRIs created through three assignments by Donald and Patricia Anderson to Blue Royalties, Inc. in 1952.  (ECF No. 1 at 6).  These assignments stated that the ORRIs "shall be computed and paid at the same time and in the same manner as royalties payable to the United States . . . ."  (ECF No. 1-1 at 1).

ii.   Class 2 includes ORRIs reserved by the Andersons in 1955.  (ECF No. 1 at 6). The Andersons assigned to third parties their entire working interest in certain BLM leases, reserving for themselves the Class 2 ORRIs using a BLM form of assignment.  (ECF No. 49 at 11).  Class 2 ORRIs include language that allows assignees to deduct from the value of oil or gas the "full amount of any taxes required to be paid . . . ."  (ECF No. 1-2 at 4).

iii.  Class 3 includes ORRIs reserved by Hondo Oil & Gas on September 5, 1978. (ECF No. 1 at 7).  Hondo completed 14 assignments of its working interests in the BLM leases in exchange for a reservation of an ORRI of 3-1/8 of 8/8ths using a

---

[5] The underlying facts of the commencement of this bankruptcy case are set forth in detail in a prior Opinion by this Court.  (*See* ECF No. 71).

BLM form of assignment.   (ECF Nos. 1-3 at 1; 49 at 11).   The forms of assignment do not include any other language describing how the ORRI should be computed.  (ECF No. 1-3).

iv.   Class 4 includes an August 1, 1951, assignment reserving an ORRI of one percent of all oil, gas, and other hydrocarbons produced on the covered property.  (ECF No. 1-4 at 1).  The form of assignment does not include language describing how the ORRI should be computed.  (ECF No. 1-4).

v.   Class 5 includes ORRIs carved out of portions of the working interest burdened by other classes of ORRIs.  (ECF No. 1 at 8, 9).  The Class 5 ORRIs are governed by an amendment executed in 2000 by McMurry Oil Company, Nerd Enterprises, Inc., Fort Collins Consolidated Royalties, Inc., and a group of ORRI owners.  The 2000 Amendment explicitly allows for the deduction of reasonable, actual costs of transportation incurred from the wellhead to the location of a sale from the proceeds of production when computing the Class 5 ORRIs.  (ECF No. 1-5 at 1).[6]

Atlantic Richfield Company ("ARCO") and Burlington Resources & Gas Company, L.P. ("Burlington") originally owned the working interests burdened by these five classes of ORRIs. (ECF No. 1 at 9).  Burlington's working interest was burdened by Classes 1, 2, 3, and 5, while ARCO's interest was burdened by Classes 1, 2, and 4.  (ECF No. 1 at 9).  In 1992, ARCO sold substantially all of its working interest to McMurry Oil, Nerd Enterprises, and Fort Collins Consolidated Royalties.  (ECF No. 1 at 9).  Burlington sold a majority of its working interest to Ultra in 1997; Ultra Continues to own this portion.  (ECF No. 1 at 9).  The amendment to the ORRIs burdening the ARCO working interest was executed in 2000.  (ECF No. 1 at 9).  After the 2000 Amendment, the ARCO working interest was burdened only by Class 5.  In late 2014, Ultra acquired the ARCO working interest, making Ultra responsible for payment of the Class 5 ORRIs.  (ECF No. 1 at 10).  Ultra continues to own a large working interest in the Sublette County leases it originally acquired from Burlington in 1997.  (ECF No. 1 at 9).

---

[6] At trial, Jonah argued that "[a]lthough the 2000 Amendment included specific language regarding deductions for certain costs," a 2004 letter from SWEPI changed the terms, and is binding on Ultra; therefore, Ultra may not deduct "costs of production" as defined in the WRPA.  (ECF No. 134 at 182). The SWEPI claim became a part of the complaint through the Joint Pretrial Statement.

In 2013, a dispute arose between Jonah and some of the Ultra defendants regarding the proper method of paying the Class 1, 2, 3, and 4 ORRIs burdening Ultra's working interest in the Pinedale Field.  (ECF No. 1 at 11).  Jonah agreed that the Class 1 ORRIs were not subject to the WRPA and therefore must be paid in accordance with their express terms.  (ECF No. 1 at 11).  Conversely, Jonah claimed that the Class 2, 3 and 4 ORRIs were subject to the WRPA's definitions and payment provisions because they did not contain specific language providing how to pay the ORRIs.  (ECF No. 1 at 11).  Thus, as to Classes 2, 3, and 4, Ultra could not deduct post-production costs in contravention of the WRPA.  In response to Jonah's contentions, Ultra alleged that it had paid all of Jonah's ORRIs in the same manner as the federal royalty interest.  (ECF No. 1 at 12).  Ultra argued that this payment calculation was justified by the language of the Class 1 ORRIs and the instruments creating Classes 2, 3, and 4.  (ECF No. 1 at 12).

On October 1, 2014, Jonah sued Ultra in Wyoming state court.  (ECF No. 71 at 4).  The parties agreed to allow discovery and summary judgment briefing on the proper deductions that may be taken under the Class 1, 2, 3, and 4 ORRI instruments as the first phase of the litigation.  (ECF No. 1 at 13).  Through discovery, Ultra first learned of the 2000 Amendment.  (ECF No. 1 at 13).  Based upon a belief that Ultra was underpaying the Class 5 ORRIs, Jonah demanded an accounting from Ultra.  (ECF No. 1 at 14).  Receiving no response, Jonah filed a separate lawsuit on April 28, 2016, also in Wyoming state court.  (ECF No. 71 at 4).

On April 29, 2016, Ultra filed for chapter 11 bankruptcy, staying the two Wyoming state court lawsuits.  (Case No. 16-32202, ECF No. 1).

On December 19, 2016, Jonah filed this adversary proceeding against Ultra seeking:

i.      A declaratory judgment on the validity and scope of ORRI Classes 1, 2, 3, 4, and 5;

ii.     A declaratory judgment that all unpaid ORRIs are property of Jonah;

iii.    Damages for breach of contract and the WRPA by Ultra;

iv.    Damages for conversion of Jonah's ORRIs by Ultra;

v.     Damages for fraud and misrepresentations by Ultra;

vi.    A constructive trust or equitable lien against proceeds from production attributable to Jonah's ORRIs;

vii.    A requirement that Ultra disgorge and reimburse Jonah for Ultra's unjust enrichment at the expense of Jonah's ORRIs;

viii.   An accounting of Jonah's ORRIs;

ix.    A permanent injunction preventing Ultra from taking deductions not permitted under the underlying instruments or the WRPA; and

x.     All other costs, penalties, and interest permitted by law.

(ECF No. 1 at 32–33).

On March 31, 2017, Jonah and Ultra filed motions for partial summary judgement in this adversary proceeding.  (ECF Nos. 48, 49).  Jonah argued that: (i) the 2000 amendment applies only to Class 5 ORRIs; (ii) the Court is not bound by an interlocutory decision in a related state court proceeding; (iii) the assignments creating Class 1 ORRIs contain specific language dictating how the ORRIs should be paid; (iv) the assignments creating Class 2, 3, and 4 ORRIs do not have specific language dictating how they should be paid and thus the WRPA's definition of "overriding royalty" applies to them; and (v) Class 5 ORRIs are subject to the specific language of the 2000 Amendment.  (ECF No. 48 at 2–3).

Ultra countered that the WRPA does not apply to any of the ORRI classes because: (i) the assignments creating those classes either contain express language dictating how the ORRIs should be paid or incorporate or reference specific federal royalty payment procedures; and (ii) alternatively, even if not specific, the WRPA is inapplicable because its provisions cannot be

applied retroactively to the ORRIs in order to modify the terms of the ORRI assignments.  (ECF No. 49 at 16–43).

On May 23, 2017, the Court held a hearing on the parties' motions for partial summary judgment.  (ECF No. 62 at 1).  On August 24, 2017, the Court denied both motions.  (ECF No. 71 at 11).  The Court found that Ultra and Jonah failed to begin their analysis by utilizing the market price in the field or at the wellhead.  (ECF No. 71 at 11).  The Court further found, with respect to Class 3 ORRIs, that it was unclear whether revenue should be based on a wellhead price or market price in the field.  (ECF No. 71 at 11).  In light of these errors, the Court determined that more information was needed to determine what gathering and other costs of production may be deducted from Jonah's ORRI payments.  (ECF No. 71 at 11).

On November 14, 2018, the Court held a hearing to determine at which point the oil and gas should be valued according to the ORRIs.  (ECF No. 134 at 8).  During Stephen Thompson's[7] testimony, Jonah addressed the farm-out overrides.[8]  (ECF No. 134 at 82).  Ultra objected on the basis that discussion of the farm-out overrides was irrelevant in light of the fact that "there is no pleaded cause of action related to the farm-out overrides in the original complaint, in the joint case management plan, [or] in the motions for summary judgment."  (ECF No. 134 at 82).  Jonah, noted, however, that the farm-out overrides were listed under contested matters in the pretrial order.  (ECF No. 134 at 85–86).  Accepting Jonah's response, the Court overruled Ultra's objection because "a matter that is identified as a contested matter in a pretrial statement serves as an amendment to the complaint.  It therefore becomes[s] live and available

---

[7] Mr. Thompson served as Jonah's expert witness.  (ECF No. 134 at 66).

[8] During the period of 2002-2005, Shell Rocky Mountain Production, LLC ("Shell") acquired from Ultra additional working interests on acreage in the Pinedale Field under a 1996 New Fork Unit Farm-out Agreement between Meridian Oil Company ("MOC") and Burlington.  (ECF No. 111–12 at 6).  As MOC's successor in interest, Shell began paying the farm-out overrides.  These were later acquired by Ultra.

for trial." (ECF No. 134 at 86). The Court, however, reserved a final ruling on the issue, pending post-trial briefing. (ECF No. 13 at 87). Subsequently, during Alan Falenski's[9] testimony, Jonah addressed a 2004 letter from SWEPI,[10] Ultra's predecessor-in-interest, addressed to Jonah (the "SWEPI Letter"). (ECF No. 134 at 206–212). Ultra objected on the same grounds, and the Court gave the same preliminary ruling, provisionally allowing testimony as to SWEPI's course of performance. (ECF No. 134 at 212).

At the conclusion of the hearing, the Court found that at the time the contracts were executed there was an underlying market belief that oil and gas was valued at the wellhead as to Classes 2, 3, and 4. (ECF No. 134 at 338). In other words, wellhead pricing was assumed when the ORRIs were formed. (ECF No. 134 at 338). Two issues, however, remained: (i) whether the WRPA can apply retroactively to alter an assumption underlying the contract, and (ii) the treatment required for a class of overrides not included in the complaint but listed as a contested matter in the pretrial order. (ECF No. 137 at 336–37). The Court requested that the parties file post-trial briefs on both these issues. (ECF No. 134 at 336–339).

## Jurisdiction

The District Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (E), and (O). Pursuant to 28 U.S.C. § 157(a), this proceeding has been referred to the Bankruptcy Court by General Order 2012-6.

---

[9] Mr. Falenski is the managing director of the following five companies: Jonah LLC, Falcon Development Company, Falcon Field Services, Jonah Gas Management Company, and Concord, LLC. (ECF No. 134 at 186).

[10] Shell Rocky Mountain Production, LLC merged into SWEPI, L.P. (ECF No. 113 at 8). Various pleadings use Shell and SWEPI interchangeably.

<u>**Analysis**</u>

**I.  The Joint Pretrial Order**

Jonah contends that "[u]nder Fifth Circuit law, matters identified as contested issues of law in the Joint Pretrial Statement are deemed to amend the pleadings and become live and available for trial."  (ECF No. 138 at 2).  Thus, both claims relating to the farm-out overrides and SWEPI's course of performance are live and available for trial.  (ECF No. 138 at 4).  Ultra acknowledges that Fifth Circuit law views a pre-trial order as an amended pleading; however, it argues that the pretrial order amends the complaint *only* when "all elements of the claim are included" in the pretrial order.  (ECF No. 137 at 20).  Specifically, Ultra argues that Jonah failed to plead damages as to its farm-out overrides claim, and therefore, the claim fails.  (ECF No. 137 at 21–22).  Ultra did not address the SWEPI claim.  (*See* ECF No. 137).

"Where a claim was not included in the complaint, but was included in the pretrial order, 'it is irrelevant that the pleadings were never formally amended.'"  *Rockwell Int'l. Corp. v. United States*, 549 U.S. 457, 474 (2007) (citing *Curtis v. Loether*, 415 U.S. 189, 190 (1974)).  "A party has presented an issue in the trial court if that party has raised it in either the pleadings or the pretrial order, or if the parties have tried the issue by consent."  *Burch v. Coca-Cola Co.*, 11 F.3d 305, 319 (5th Cir. 1997).  "It is well settled that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial."  *Elvis Presley Enters. Inc. v. Capece,* 141 F.3d 188, 206 (5th Cir. 1998).  Therefore, the inclusion or incorporation of a claim or issue in the pre-trial order amends the previous pleadings to state the new claim.  *Rockwell Int'l. Corp.*, 549 U.S. at 474.  "[E]ven when neither the pleadings nor the pretrial order contain a claim, that claim may still proceed if the record contains sufficient evidence to convince the court that the parties consented to the adjudication of the issue."  *Elder*

*Offshore Leasing, Inc. v. Bolivarian Republic of Venezuela*, 297 F. App'x 351, 355 (5th Cir. 2008).

The parties agree that a joint pretrial order signed by both parties amends a complaint. *Rockwell Int'l. Corp.*, 549 U.S. at 474. Here, the claim regarding SWEPI's course of performance was listed as a contested issue in the joint pretrial order. (ECF No. 107 at 13 ("How the practical construction and course of performance of Ultra, the Jonah Plaintiffs and/or their predecessors-in-interest affects how the Plaintiff's ORRI payments should be calculated.")). The joint pretrial statement supersedes the complaint as to this claim. Accordingly, the claim is live and available for decision.

The joint pretrial order also lists the farm-out overrides as contested issues of law. (ECF No. 107 at 9, 13 ("Do the WRPA definitions of 'overriding royalty' and 'costs o[f] production' apply to the Farm-Out Overrides?")). Ultra, however, argues that Jonah failed to "sufficiently plead a cause of action as to the Farmout Overrides." (ECF No. 137 at 21). Ultra contends that in failing to include the farm-out overrides in their damage model, Jonah failed to properly include all elements of a breach of contract claim. (ECF No. 137 at 22). Thus, the claim fails. Specifically, Ultra highlights Plaintiff's Exhibit 30, an attachment to the joint pretrial statement, noting that according to Jonah's damage model, its Class 1 through Class 4 overrides comprise 100% of its damages. (ECF No. 137 at 21). In essence, Ultra claims that Jonah failed to account for the farm-out overrides when assessing its own damages and therefore has plead an incomplete claim. Ultra, however, fails to note that Jonah explicitly states in the same exhibit that it is also seeking damages for the farm-out overrides.[11] (ECF No. 111-12 at 8). Jonah explains that the imprecise percentage totals reflect the lack of available information:

---

[11] Jonah notes:

55. Therefore it can be reasonably concluded that the Class 1 Overrides account for *less than* 16.632% of the total overrides paid to date by Ultra to Jonah LLC. However, *more precise information related to the percentage of total overrides paid by Ultra that are attributable to the Farm-out Overrides*, the Shell Overrides, and other miscellaneous overrides burdening the Ultra working interest *was not available to the Owners*.

(ECF No. 111-12 at 12) (emphasis added).  Therefore, Jonah has alleged damages based on its farm-out overrides claim against Ultra.  (ECF No. 111-12 at 8-12).

Accordingly, both claims, which were included in the joint pretrial order as contested issue of law, are live and available for decision.  *Elvis Presley Enters. Inc.,* 141 F.3d at 206.

## II. The Wyoming Royalty Payment Act

As noted above, the Court found that at the time the contracts creating Jonah's ORRIs were executed, the parties' intended to use wellhead price as the starting point for royalty calculation.  (ECF No. 134 at 338).  Wellhead pricing is an implied term and a contractual assumption in the underlying contracts.  The crux of the issue before the Court is whether the WRPA's definitions of "overriding royalty" and "costs of production" apply to ORRI Classes, which contain no express or specific language but rather are defined under the wellhead price implied term in the underlying contracts.  Neither party disputes that: (i) the contracts were created prior to the WRPA's enactment and (ii) the WRPA provisions only apply when the parties have not provided otherwise in a valid agreement.  (*See* ECF No. 107).  Therefore, Jonah and Ultra agree that the Class 1 ORRIs are governed by the explicit language contained in the underlying agreements.  (ECF No. 107 at 3–4).  They disagree, however, as to Classes 2, 3, 4 and

---

It is the Owner's position . . . that the Farm-out Overrides do not provide "specific language in an executed written agreement" as specified in § 30-5-305(a), and therefore are subject to the WRPA prohibition against deducting costs of production.  *The Owners are also asserting claims for damages for Disallowed Deductions taken on the Farm-out override payments from Ultra.*

(ECF No. 111-12 at 8) (emphasis added).

5, and the farm-out overrides.  (ECF No. 107 at 3–4).  Jonah argues that the WRPA provisions control as to those five classes, while Ultra maintains that a retroactive application of the WRPA would create a substantial impairment to the parties' expectations under the agreements.  The Court must therefore determine whether the WRPA retroactively applies to change an implied term in the contract.

*The WRPA's Language & Purpose*

In Wyoming, royalties and overriding royalties are to be computed in accordance with the WRPA, "unless other periods or arrangements . . . are provided for in a valid contract with the person or persons entitled to such proceeds."  WYO. STAT. § 30-5-305(a).  In other words, ORRIs must be computed in accordance with WRPA's provisions unless the parties provide, through agreement, a different method of calculation.  In such cases, the agreement between the parties controls.

The WRPA, effective June 1, 1982, "was enacted to ensure the proper payment of proceeds derived from production of oil, gas or related hydrocarbons by *providing time limits* within which payments must be made, and also by *mandating penalty interest* to be paid on delayed payments and shifting payment costs, penalties and attorney's fees to recalcitrant royalty payors."[12]  Brandin Hay, *Wyoming's Royalty Payment Act*, 31 LAND & WATER L. REV. 823, 823 (1996) (emphasis added) (internal citations omitted).

The 1989 amendments to the WRPA provided definitions for key terms, "mandated uniform payment reports to owners of royalties, and penalized payors of royalties for failing to

---

[12] "The act takes effect when the lessee discovers a royalty payment deficiency."  *Hartman*, 226 P.3d at 916 (citing *Cities Serv. Oil & Gas Corp. v. State*, 838 P.2d 146, 156 (Wyo. 1992)).  "It provides deadlines for payments of royalties to persons 'legally entitled' to such payments, although the parties may by contract provide other 'arrangements for first and subsequent payments.'"  *Id*.  The Act also requires that the appropriate parties provide royalty information to the royalty or other interest owners in accordance with the statutes.  WYO. STAT. § 30-5-301(a).  Under the WRPA, a party obligated to make a payment is liable for 18% interest on payment not made in accordance with the Act.  WYO. STAT. § 30-5-303(a).

make proper payment reports."  Brandin Hay, *Wyoming's Royalty Payment Act*, 31 LAND &
WATER L. REV. 823, 823 (1996) (internal citations omitted).  Among the definitions applicable to
the question at issue are the WRPA's definitions of "overriding royalty" and "costs of
production."  The WRPA defines "overriding royalty" as "a share of production, free of the costs
of production, carved out of the lessee's interest under an oil and gas lease.  WYO. STAT. § 30–5–
304(a)(v).  As defined above, "costs of production" include all of the costs incurred for
exploration, development, recovery, and abandonment operations under the underlying leases.
WYO. STAT. § 30–5–304(a)(vi).  "Costs of production" do not include the costs associated with
transporting the oil or gas to market.  *Id*.  The parties do not dispute the meaning of the
definitions provided in § 30-5-304, rather the crux of the issue before the Court is whether the
WRPA's definitions apply to Classes 2, 3, 4, 5, and the farm-out overrides.

*Retroactivity*

In Wyoming, the primary purpose when construing a statute is to determine the intent of
the legislature.  *Moncrief v. Harvey*, 816 P.2d 97, 105 (Wyo. 1991).  Legislative intent should be
ascertained, as nearly as possible, from the language of the statute viewed in the light of its
object and purpose.  *Id*. (citations omitted).

The WRPA "is intended to 'stop oil [and gas] producers from retaining other people's
money for their own use.'"  *Hartman*, 226 P.3d at 916 (citations omitted).  The Act "was
designed to protect royalty owners and permit them to determine if correct payment of royalties
has been made."  *Wold v. Hunt*, 52 F. Supp. 2d 1330, 1334 (D. Wyo. 1999).  Thus, the WRPA is
intended to be *remedial* and the Wyoming Supreme Court construes its provisions liberally to
achieve the Act's remedial purpose.  *Id*. (emphasis added).  As noted above, Ultra does not

challenge the WRPA's definitions or intent, rather it argues that it cannot be applied retroactively to alter its contractual rights.

The leases in this dispute are governed by Wyoming Law.  Except in matters governed by the Constitution or by acts of Congress, it is the role of the federal courts to apply the law of the state, whether "declared by its Legislature in a statute or by its highest court in a decision."  *Erie R. Co. v. Tompkins*, 304 US 64, 78 (1938).  This includes the interpretation of state statutes.  *See Cardebas v. United of Omaha Life Ins. Co.*, 731 F.3d 496, 499 (5th Cir. 2013).  When state law questions have not been answered by the highest court of the state, it is the duty of the federal court to decide the case as would an intermediate appellate court of the state in question. *Transcon Gas Pipeline Corp. v. Transp. Ins. Co.*, 958 F.2d 622, 623 (5th Cir. 1992); *Guilbeau v. Hess Corp.*, 854 F.3d 310, 315 (5th Cir. 2017).  The retroactivity of the WRPA is not entirely settled.  However, a number of decisions by the Wyoming Supreme court inform this Court's decision as to the applicability of the WRPA here.

The Wyoming Supreme Court has addressed retroactivity as applied to the WRPA on various occasions.  In *Indep. Prod. Mktg. Corp. v. Cobb*, the Supreme Court of Wyoming first discussed retroactivity as applied to the WRPA.  721 P.2d 1106 (Wyo. 1986).  Although the issue did not ultimately require the court to retroactively apply the WPRA, its discussion is instructive.  In *Cobb*, the operator withheld royalties owed under the lease until 1984, four years after it became liable, and almost two years after the effective date of the WRPA.  *Id*. at 1107-08. The royalty owner filed suit, seeking payments plus statutory penalties pursuant to § 30-5-303 of the WRPA.  *Id*. at 1108.  The trial court held in favor of the royalty owner and the operator appealed, arguing that the trial court applied the interest penalty provision of the WRPA retroactively since the triggering event was the production of oil and gas, which precipitated the

Act's interest penalty.  *Id*. at 1109.  On appeal, the Supreme Court of Wyoming agreed with the operator that the "Act contains no explicit retroactivity language, and therefore, should only be applied prospectively . . . ."  *Id*.[13]  It found, however, that the district court had not applied the act retroactively, because the triggering event occurred after the WRPA's effective date.  *Id*. (finding nonpayment, which occurred after the Act's effective date, not production, which occurred prior to the Act's enactment, was the triggering event).

In *Moncrief v. Harvey*, the Wyoming Supreme Court revisited the issue of retroactivity. 816 P.2d 97 (Wyo. 1991).  In *Moncrief*, the trial court awarded the royalty interest owner 18% penalty interest pursuant to § 30-5-303(a) of the WRPA on production occurring during and after the WRPA's enactment.  *Id*. at 101.  Relying on *Cobb*, the Wyoming Supreme Court reversed the trial court's decision, holding that the operator was entitled to the WRPA's six-month grace period and therefore, interest began accruing following the WRPA's enactment.  *Id*. at 106. Similarly, although the production at issue in *Moncrief* commenced prior to the WRPA's enactment, the court held that the triggering event occurred after the Act's effective date and thus, it was not applied retroactively.  *Id*. ("We see no reason for treating an obligor whose obligation began to accrue *before* the effective date of the Act any differently from one whose obligation arose *after* the Act, *so long as the Act is not applied retroactively*." (emphasis added)).

In *Cities Serv. Oil & Gas Corp. v. State*, the Wyoming Supreme Court made a similar application and allowed an operator to benefit from the six-month grace period recognized in

---

[13] The court in *Cobb* noted:

> Wyoming has long followed the general rule that retrospective application of a statute to events occurring before [its] enactment . . . is not favored.  [A] provision will operate prospectively only, unless the words employed show a clear intention that it should have a retrospective effect.

*Id*. at 1109.

*Cobb* and *Moncrief* for production and sale which predated the effective date of the WRPA. 838 P.2d 146, 156 (Wyo. 1992). Again, the Wyoming Supreme Court avoided retroactive application of the Act. *Id*. (finding "interest began to accrue not later than 60 days after the end of the calendar month within which subsequent production is sold").

These decisions highlight the Wyoming Supreme Court's concern with a royalty owner's right to timely payments. As noted above, the WRPA sets time limits for payments to royalty owners and penalties against operators who fail to comply with the limits prescribed. In applying the WRPA, the Wyoming Supreme Court construed the Act in a way that would carry out its intended purpose—protecting royalty owners by permitting them to determine the correct payment of royalties. However, the Wyoming Supreme Court was notably cautious in applying the statute retroactively.

Retroactivity is disfavored in the law. *See Mullinax Concrete Serv. v. Zowada*, 275 P.3d 474, 476 (Wyo. 2012) ("[R]etrospective application of a statute to events occurring before enactment of a statute is not favored."); *see Bowen v. Georgetown Univ. Hosp*., 488 U.S. 204, 208 (1988) (noting that generally "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result"). There is no explicit language in the WRPA that provides for its retroactive effect; therefore, the presumption is that the statute should only apply prospectively. *Cobb*, 721 P.2d at 1109. Although the decisions of the Wyoming Supreme Court mainly dealt with the penalty provision of the WRPA, its reasoning is instructive. The Wyoming Supreme Court's reasoning counsel in favor of avoiding retroactive application of the WRPA. Nevertheless, the Wyoming Supreme Court has emphasized the Act's remedial nature. *See Moncrief*, 816 P.2d at 105 ("The Act is a remedial statute and, as such, is to be liberally construed to achieve its remedial purpose."). It is the Act's

remedial nature and purpose that Jonah highlights in arguing for its application to the underlying contracts.

*Contracts Clause*

At the conclusion of trial, this Court found that at the time the contracts were created, it was assumed that overriding royalty owners were to receive payments from the oil and gas at the wellhead.  (ECF No. 134 at 338).  Thus, wellhead pricing was an implied term of the contracts underlying ORRI Classes 2, 3, and 4.  A state statute that impairs an implied contract term would be in violation of the Contracts Clause.  *See generally Gen. Motors Corp. v. Romein*, 503 U.S. 181, 188 (1992) (finding the contract at issue did not contain express or implied terms that were subject to the Contracts Clause).  Therefore, the Court must determine whether the WRPA may retroactively apply to replace the implied term of wellhead prices in the parties' contracts with the WRPA's definitions under § 30-5-304(a).

Jonah argues that the WRPA applies to ORRI Classes 2, 3, 4, and the farm-out overrides because the application of the WRPA would not cause substantial impairment to the parties' rights under the contract.  (ECF No. 138 at 15-17).  Specifically, Jonah argues that considering the existence of "state overriding royalty payment regulation" at the time Ultra purchased its working interest in the leases, it should have expected further federal and state regulation, such as the WRPA.  (ECF No. 138 at 17).  Jonah further maintains that even if the WRPA acted to impair Ultra's rights, such impairment serves a legitimate public purpose—to standardize business practices and terms in the Wyoming oil and gas industry and, therefore, the adjustment is minimal and justified.  (ECF No. 138 at 21-23).

Ultra counters that a retroactive application of the WRPA acts as a substantial impairment to its rights under the contracts because the "modification imposes an obligation or

liability that was unexpected at the time the parties entered into the contract and relied on its terms." (ECF No. 137 at 17) (citation omitted). Specifically, Ultra argues that in changing the point of valuation, the WRPA acts to "effectively transfer[] a significant amount of revenue from one party to another." (ECF No. 137 at 20). Such a drastic change amounts to substantial impairment of its rights under the contract. (ECF No. 137 at 15–17).

Article I, § 10, of the Constitution provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Contracts Clause "restricts the power of States to disrupt contractual arrangements, but it does not prohibit all laws affecting pre-existing contracts . . . ." *Sveen v. Melin*, 138 S. Ct. 1815, 1817 (2018). Courts apply a two-step test in determining whether a statute violates the Contracts Clause. *Id*. The threshold inquiry is whether the state law has operated as a substantial impairment on a contractual relationship." *Id*. (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). If a court finds substantial impairment, "the inquiry turns to the means and ends of the legislation." *Id.*[14]

The substantial impairment inquiry has three components: "whether there is a contractual relationship, whether a change in law impairs the contractual relationship, and whether the impairment is substantial." *Gen. Motors Corp.* 503 U.S. at 186; *see Sveen* 138 S. Ct. at 1817 (noting courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights"). Total destruction of contractual expectations is not necessary for a substantial impairment finding. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). "On the other hand, state regulation that restricts a party to gains it

---

[14] *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, uses this same two-step test, but splits it into three sections. 459 U.S. 400, 411–13 (1983). The Court will do the same here.

reasonably expected from the contract does not necessarily constitute a substantial impairment." *Id*. In determining the extent of the impairment, courts are to consider whether the industry the complaining party has entered has been regulated in the past. *Id*.

"If a substantial impairment is found, the State, in justification, must have a significant and legitimate public purpose behind the regulation." *Id*. at 412. "One legitimate state interest is the elimination of unforeseen windfall profits." *Id*. The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Id*. "Once such a purpose has been identified, the adjustment of the contracting parties' rights and responsibilities must be based upon reasonable conditions and must be of a character appropriate to the public purpose justifying the legislation's adoption." *Id*. "[C]ourts defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Id*.

### i. *Substantial Impairment*

The threshold inquiry is whether the WRPA, if applied to classes 2, 3, 4, 5 and the farm-out overrides would substantially impair Ultra's contractual rights. Whether the parties are operating in a regulated field is significant to the inquiry. *Id*. at 413. The underlying leases stem from fifteen BLM leases issued between 1950 and 1952. (ECF Nos. 1 at 6; 49 at 9).[15] ARCO and Burlington originally owned the working interests burdened by the five classes of ORRIs. (ECF No. 1 at 9). Ultra acquired the majority of Burlington's working interest in 1997 and ARCO's working interest in late 2014. (ECF No. 1 at 9–10). The WRPA was enacted in 1982, and its amendments, which include the definitions at issue, came into effect in 1989.

---

[15] Class 3 and Class 4 were created in the 1950s and 1970s. (ECF No. 138 at 16).

Bryan Hassler and Kris Terry, as expert witnesses for Jonah and Ultra, respectively, testified that at the time the underlying leases were executed, the industry was heavily regulated, and prices were based on wellhead price.  (ECF No. 134 at 118, 255 (noting that up until the mid-1980s, "producers [] had no choice," and "were driven and beholden to what essentially was a monopoly of the interstate pipeline systems purchasing gas at the wellhead or at the field level . . . ")).  In 1985, the Federal Energy Regulatory Commission ("FERC") issued Order Number 436, which allowed producers to sell directly to a third party without the need to sell through a pipeline company.  (ECF No. 134 at 118–119, 253).  In the 1990s, FERC Order Number 636 took the issue a step further and "required the pipelines to unbundle their sales function with purchases of natural gas and resell to end use customers from their transportation and storage functions."  (ECF No. 134 at 119).  In essence, Order 636 required pipelines to separate selling gas and transporting gas.  Thus, the industry evolved over time to the point at which "pipelines are no longer in control of the transportation facility," meaning buyers and sellers are free to negotiate among each other, rendering "for the most part, a completely deregulated market." (ECF No. 134 at 119, 254).[16]

Jonah cites *Energy Reserves* for the proposition that Ultra purchased its interest subject to the WRPA and therefore "knew its contractual rights were subject to alteration by both federal and state regulation."  (ECF No. 138 at 17).  In *Energy Reserves*, a public utility company and a gas supplier entered into two intrastate natural gas supply contracts.  459 U.S. 403.  Each contract contained two clauses: an indefinite price escalator clause and a governmental price escalator clause.  *Id*.  Three years after the contracts were executed, a federal act and a state act

---

[16] "[W]ith the publishing of Federal Energy Regulatory Commission (FERC) Order Number 436 and 500 in 1985, and Order 636 in 1992, natural gas purchase and transport became increasingly competitive in a restructured industry characterized by de-integration and customer choice."  Douglas N. Jones, *Regulatory Concepts, Propositions, and Doctrines: Casualties, Survivors, Additions*, 22 ENERGY L.J. 41, 45 (2001).

were enacted, both of which regulated prices in the interstate gas market.  *Id*. at 406.  In finding that the state act did not violate the Contracts Clause, the Supreme Court highlighted that "making any contractual term subject to relevant present and future state and federal law" through the price escalator clauses "suggests that [the gas supplier] knew its contractual rights were subject to alteration by state price regulation."  *Id*. at 402, 416.  Not only did price regulation exist at the time the contracts were executed, but it was foreseeable to the point that the parties included the potential regulation in their contracts; therefore, there was no impairment.  *Id*. at 416.

No such foreseeability is present here.  Contrary to the facts in *Energy Reserves*, when Ultra purchased its working interests in the Pinedale Field in the mid-to-late 1990s, the industry was in a state of deregulation, which gave buyers and sellers larger freedom in negotiating deals. (ECF No. 134 at 254).  The changes to which the expert witnesses testified related to the relationship between producers and pipeline companies rather than cost-shifting between producers and royalty interest owners as to transportation costs.  (ECF No. 134 at 118–19, 253–54) ("Producers are free to identify places where they can sell gas, and enter into all the appropriate contracts . . . .").  Furthermore, unlike in *Energy Reserves*, none of the underlying leases made sale prices subject to alteration in connection with "present and future state and federal law."  *Id*. at 416.  Rather, as this Court held, the contracts operated under the assumption that prices were based at the wellhead as was customary at the time.[17]  This assumption along with the state of the industry at the time Ultra purchased its working interests, do not suggest that "Ultra knew its contractual rights were subject to alteration by both federal and state regulation" as was the case in *Energy Reserves*.  (ECF No. 138 at 17).

---

[17] Ultra notes that silence as to method for royalty calculation along with reference to "market value" or "market price prevailing in the field" were historically utilized to calculate federal lessor's royalty.  (ECF No. 116 at 9).

Applying the WRPA would change the point of valuation, which would then shift the burden of transportation costs.  Shifting the burden of transportation costs in accordance with the WRPA would increase Jonah's royalty payments significantly.  (ECF No. 137 at 19 (arguing Jonah's damage model seeks $6,783,922.00 in under paid overriding royalty payments, interest, attorney's fees, and costs).  Thus, Ultra's rights would be impaired if the WRPA were to apply retroactively to change the point of valuation and the impairment would be substantial.

It is appropriate to now focus on the economics of this dispute.  Although there may be variations at final trial, the simple paradigm that confronts the Court can be explained by a hypothetical example, with these three assumptions:

1.  The market value of the produced gas at the wellhead is $1,000,000.

2.  The market value of the produced gas at the delivery point is $1,200,000.

3.  The market has efficient pricing.

Under that hypothetical scenario, one can assume that the cost of transporting the gas is $200,000.  If the WPRA does not apply, Ultra would pay Jonah $1,000,000.  That is the contracted price under this "efficient market" hypothetical.  Jonah demands that it receive $1,200,000, with no deduction for transportation costs.  The difference is a direct modification of the parties' contractual rights.

The hypothetical example does not end the discussion.  The market may not be efficient.  For example, it is possible that the wellhead price in the hypothetical example would be $1,100,000.  Because the market may be inefficient, it is possible that the price received by Ultra at the delivery point minus the transportation costs from the wellhead to the delivery point would not equal the wellhead price.  Jonah is entitled to the upside (or must suffer the downside) of any such market inefficiencies.  It is entitled to wellhead value.  Deducting post-production costs

may be a good proxy for determining well-head pricing.  However, the Court does not have any evidence before it demonstrating that a deduction of post-production costs will produce accurate well-head value.

    ii.    *Legitimate Public Purpose*

"If a substantial impairment is found, the State, in justification, must have a significant and legitimate public purpose behind the regulation." *Energy Reserves*. U.S. 459 at 412.  There is no question that the WRPA serves a legitimate public purpose.  The WRPA exemplifies "the legislature's obvious intent to stop oil producers from retaining other people's money for their own use." *Cities Serv.,* 838 P.2d at 156 (quoting *Cobb,* 721 P.2d at 110).  The Wyoming legislature was concerned with ensuring timely and correct payments for royalty owners.  *Wold*, 52 F. Supp. 2d at 1335 (noting the Act "was designed to protect royalty owners[] and permit them to determine if correct payment of royalties has been made.").  It enacted the WRPA "to ensure the proper payment of proceeds derived from production of oil, gas or related hydrocarbons *by providing time limits* within which payments must be made and also *by mandating penalty interest* to be paid on delayed payments and shifting payment of costs, penalties and attorney's fees on recalcitrant royalty payors."  Brandin Hay, *Wyoming's Royalty Payment Act*, 31 LAND & WATER L. REV. 823, 823 (1996) (emphasis added) (internal citations omitted).  In providing limits for when payments should be made and relief to royalty owners who are not paid accordingly, the legislature sought to remedy "a broad and general [] economic problem." *Allied Steel*, 438 U.S. at 247.

    iii.    *Reasonable Conditions*

"Once a legitimate public purpose is identified, the next inquiry is whether the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is

of a character appropriate to the public purpose justifying the legislation's adoption." *Energy Reserves*, 459 U.S. at 412 (internal quotations omitted).  The means chosen to implement the WRPA's intent is not deficient.  This is so because the Act limits the extent of its reach.

The WRPA states:

> The proceeds derived from the sale of production from any well producing oil, gas or related hydrocarbons in the state of Wyoming shall be paid to all persons legally entitled thereto . . . commencing not later than six (6) months after the first day of the month following the date of first sale and thereafter not later than sixty (6) days after the end of the calendar month within which subsequent production is sold, *unless other periods or arrangements for the first and subsequent payments are provided for in a valid contract with the person or persons entitled to such proceeds.*

WYO. STAT. § 30-5-301 (emphasis added).  Although the WRPA sets time limits for timely payments to royalty owners, it acknowledges that a time frame for payment may also be established through a legal agreement between the parties.  *Id*; *see Ferguson v. Coronado Oil Co.,* 884 P.2d 972, 979 (Wyo. 1994); (ECF No. 68-3 at 14 ("The legislature did not usurp the parties' ability to contract—it merely provided definitions in case of [contractual] silence.").  This acknowledgement applies equally to the definitions found in § 30-5-304(a).  (ECF No. 138 at 21 ("[T]he WRPA specifically requires the § 304 definitions to be applied to leases where those terms have been left undefined.")).  Thus, although the Act serves the legitimate purpose of protecting royalty payment owners, it does not and was not intended to supplant a valid contract between parties.  Accordingly, the adjustment of the rights and responsibilities of contracting parties is based upon reasonable conditions and is appropriate to the public purpose justifying the WRPA's adoption.  *Energy Reserves*, 459 U.S. at 412.  Here, however, the WRPA cannot be applied retroactively because the parties fall within the Act's limitation—they have agreed to calculate the ORRIs differently through a valid contract.  Here, the adjustment of the rights and

responsibilities of the contracting parties would not be appropriate in light of the public purpose that justifies the legislation's adoption. *Energy Reserve*, 459 U.S. at 412.

As noted above, this Court found that at the time the contracts were executed, it was an assumption under the contract that the overriding royalty owners were to receive payments from the oil and gas valued at the wellhead. (ECF No. 134 at 338). Wellhead pricing was an implied term under the contracts. The WRPA is a remedial act of legislation, intended to ensure timely and correct payments to royalty owners by establishing payment time frames for producers and creating penalties for those producers who fail to comply with the time limits prescribed. In its decisions addressing retroactivity regarding the WRPA's application, the Wyoming Supreme Court highlighted the Act's prospective application, unless explicitly indicated otherwise. Furthermore, both the state of the industry since the contracts were executed and the Act itself highlight the Wyoming legislature's intent to allow parties' contractual freedom. Accordingly, the WRPA cannot apply retroactively to change the implied wellhead pricing term.

### III. Calculation of ORRIs

The following are not in dispute: (i) chain of title, (ii) the allocation of damages amongst the Jonah Plaintiffs; (iii) what percentage of the total ORRI owned by the Jonah Plaintiffs is allocated to each class of Override, and the Jonah Plaintiffs' ownership of the overrides. (ECF No. 107 at 5).

*Class 1*

Both parties agree that the Class 1 overrides contain express language dictating how the ORRIs are to be computed. (ECF No. 124 at 27 "[T]he Jonah Plaintiffs do not dispute that in . . . Class One, there are revenues generated and paid and deductions taken that . . . are the same as if

the Federal Government had been the payee.")).  Therefore, the Class 1 ORRIs are not subject to the WRPA.

*Class 2*

The Class 2 overrides include ORRIs reserved by the Andersons in 1955 (ECF No. 1 at 6).  The Andersons assigned to third parties their entire working interest in certain BLM leases, reserving for themselves the Class 2 ORRIs using a BLM form of assignment.  (ECF No. 49 at 11).  The Class 2 ORRI instruments contain the following language:

> Said overriding royalty shall be computed and paid on the basis of the market price for oil [and] gas . . . prevailing in the field where produced for . . .oil [and] gas . . .of like quality . . . .
>
> In computing the amounts to be paid . . . assignees shall have the right to deduce from the value of the oil [and] gas . . . or the proceeds thereof, upon which said overriding royalty is computed the full amount of any taxes required to be paid on such oil [and] gas . . . for or on account of the production or sale thereof, including the so-called post-production.

(Joint Exhibit 2 at 4).  Other than this language, Class 2 does not provide how to calculate overriding royalty interests.  At trial, the Court held that at the time the contracts were executed there was an assumption that royalties were to be calculated using wellhead pricing.  (ECF No. 134 at 339 ("[W]hen the contracts were executed, there was an underlying belief by everyone in the market, because that it what existed in the market, that we were talking about wellhead prices.")).  The language referring to "market price . . . prevailing in the field" in Class 2 ORRIs, therefore, refers to wellhead pricing.  Accordingly, the WRPA does not apply to Class 2.  Jonah is entitled to wellhead value.

*Class 3*

The Class 3 overrides include ORRIs reserved by Hondo Oil & Gas on September 5, 1978.  (ECF No. 1 at 7).  Hondo completed 14 assignments of its working interest in the BLM

leases in exchange for a reservation of an ORRI of "3-1/8% of 8/8ths." (ECF Nos. 1-3 at 1; 49 at 11). There is no specific language that expressly provides costs or expenses that may be deducted from the value of production when computing the ORRI payments. As noted above, the Court held that at the time the contracts were executed there was an assumption that royalties were to be calculated using wellhead pricing. Therefore, the WRPA does not apply to Class 3. Jonah is entitled to wellhead value.

*Class 4*

Class 4 includes an August 1, 1951 assignment reserving an ORRI of one percent of all oil, gas, and other hydrocarbons produced on the covered property. (ECF No. 1-4 at 1). The form of the assignment does not contain language describing how the ORRI should be computed, other than stating the percentage of overriding royalty reserved. Similar to Class 3, there is no specific language in Class 4 ORRIs that expressly provides costs or expenses that may be deducted from the value of production when computing the ORRI payments. (ECF No. 119 at 3). As noted above, the Court held that at the time the contracts were executed there was an assumption that royalties were to be calculated using wellhead pricing. Therefore, the WRPA does not apply to Class 4. Jonah is entitled to wellhead value.

*Class 5*

In 2000, Jonah "and/or their predecessors in interest entered into an agreement ("the 2000 Amendment") with a successor of ARCO, which held a 25% working interest" burdened by Classes 1, 2 and 4. (ECF Nos. 113 at 7; 116 at 4). The 2000 Amendment created "the Class 5 overrides."[18] (ECF No. 119 at 3). Ultra was not a signatory to the 2000 Amendment and the

---

[18] The Class 5 Overrides however are not new ORRIs. (ECF No. 116 at 4). The 2000 Amendment only contained agreements pertaining to portions of the pre-existing Class 1, Class 2, and Class 4 ORRIs as to the 25% proportional share which had been owned by ARCO. (ECF No. 116 at 4).

75% working interest Ultra acquired from Burlington is not burdened by the Class 5 overrides. (ECF No. 113 at 8).

Jonah contends that "[a]lthough the 2000 Amendment included specific language regarding deductions for certain costs," the 2004 SWEPI letter is binding on Ultra and therefore Ultra may not deduct "costs of production" as defined in the WRPA. (ECF No. 119 at 3). Ultra counters that the 2000 Amendment's purpose was to "confirm the existing method for calculating the ORRIs" and serves as an acknowledgement by Jonah that "all overriding royalty payments with respect to oil, gas and other hydrocarbons produced prior to the effective date . . . have been timely and properly paid." (ECF No. 106 at 11–12 (quoting Joint Exhibit 5)). In essence, Ultra argues the terms of the 2000 Amendment control as it is not bound by the 2004 SWEPI Letter.

On May 31, 2000, "Jonah or their predecessors entered into a written agreement with the working interest owners concerning how the ORRIs [for Class 5] should be calculated." (ECF No. 106 at 11). The 2000 Amendment provides:

> For production sold in arm's-length transactions, the overriding royalties shall be calculated on the basis of the proceeds received from the sale of the production *less the reasonable, actual costs of transportation only incurred from the wellhead to the place where the sale occurs* . . . For transportation downstream of the Jonah Pipeline, if such transportation is non-arm's length, the deductible transportation costs shall not exceed the lesser of: (i) the actual costs, (ii) maximum applicable tariff rate, or (iii) the amount allowed to be deducted in the calculation of a non-arm's length transportation allowance for federal royalty purposes.

(Joint Exhibit 5 at 1) (emphasis added). Thus, the 2000 Amendment contains clear and specific language dictating the deductible post-production costs.

On September 23, 2004, Shell[19] sent a letter to the working interest owners subject to Class 5 ORRIs noting that in light of the Supreme Court of Wyoming's decision in *Cabot Oil & Gas Corp. v. Followill*, 93 P.3d 238 (Wyo. 2004) it would modify its accounting for gas produced. (Plaintiff's Exhibit 13 at 1). The 2004 SWEPI Letter notes:

> Unless specifically agreed, Shell will no longer pass any Post Production Cost deductions (i.e., gathering, transportation, etc.) to the private royalty and overriding royalty owners. Therefore, you should not see any Post Production Cost deductions on your detail statement. However, we reserve the right in the future to take any deductions deemed appropriate in accordance with the laws of the State of Wyoming and any existing or future contracts.

(Plaintiff's Exhibit 13 at 1). Ultra acquired SWEPI's working interest in 2014 and became aware of the 2000 Amendment through discovery in a state court suit. (ECF Nos. 1 at 13; 113 at 8). The issue is whether Ultra is bound by the terms of the 2004 SWEPI Letter.

An assignment of an oil and gas lease is a contract, thereby requiring instruments to be construed according to the rules of contract interpretation. *Wolter v. Equitable Res. Energy Co.*, 979 P.2d 948, 951 (Wyo. 1999). A court's primary focus when interpreting a contract is the parties' intent. *Ultra Res., Inc. v. Hartman*, 226 P.3d 889, 905 (Wyo. 2010); *Carlson v. Flocchini Invs.*, 106 P.3d 847, 854 (Wyo. 2005). The initial inquiry in determining intent is to determine whether the contract is clear or ambiguous. *Wolter*, 979 P.2d at 951. An ambiguous contract is one which has language that conveys either an obscure meaning or conveys more than one meaning. *Id*. If a written agreement has clear and unambiguous language, courts recognize the words of the agreement to be the parties' intentions. *Boley v. Greenough*, 22 P.3d 854, 858 (Wyo. 2001). The language used within the contract must be given effect that a reasonable person at the time and place the contract was made would give the agreement. *Hartman*, 226 P.3d at 905. In doing so, courts should construe the language of the contract "within the context

---

[19] Shell Rocky Mountain Production LLC merged into SWEPI LP. (ECF No. 113 at 8). Parties refer to both entities interchangeably.

in which it was written, and the court may look to the surrounding circumstances,[20] the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made." *Wadi Petroleum, Inc. v. Ultra Resources, Inc.*, 65 P.3d 703, 708 (Wyo. 2003).

Here, the 2000 Amendment was intended to outline the specific post-production deductions that should be taken from ORRI Class 5. (*See* Joint Exhibit 5). The 2000 Amendments is unambiguous. Jonah, however, argues that the terms of the 2004 SWEPI Letter take precedence over the express terms in the 2000 Amendment. Specifically, Jonah maintains that Ultra's course of performance as to certain Class 5 wells binds Ultra to the terms in the 2004 SWEPI Letter. (ECF No. 119 at 7 ("Ultra continues SWEPI's course of performance and does not deduct 'costs of production' as defined by the WRPA with regard to some wells.")). The Court disagrees.

Under Wyoming law, "'course of performance' is a sequence of conduct between the parties to a particular transaction that exists if: (i) [t]he agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and (ii) [t]he other party, with knowledge of the nature of the performance and opportunity to object to it, accepts the performance or acquiesces in it without objection." WYO. STAT. § 34.1-1-303(a). Generally, "the express terms of an agreement and any applicable course of performance, course of dealing,

---

[20] In assessing the type of extrinsic evidence allowed, the *Hartman* court noted:

> This Court has, for many years stated that courts should consider circumstances surrounding execution of an agreement, i.e., facts showing the parties' relationship, the subject matter of the contract, and the parties' apparent purpose in making the contract, to determine the parties' intention, even when reviewing unambiguous contracts . . . In *Boley* . . . we recognized the importance of interpreting contracts *at the time and place of execution* because the term "overriding royalty" used in a conveyance thirty years before had a different meaning than it did at the time of interpretation.

*Hartman*, 226 P.3d 889, 909 (internal citations omitted).

or usage of trade shall be construed whenever reasonable as consistent with each other.  If such a construction is unreasonable . . . (i) [e]xpress terms prevail over course of performance, course of dealing, and usage of trade."  WYO. STAT. § 34.1-1-303(e).  However, "a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance."  WYO. STAT. § 34.1-1-303(f).  A party may retract the waiver through "reasonable notification . . . that strict performance will be required . . .unless the retraction would be unjust in view of a material change in position in reliance on the waiver."  WYO. STAT. § 34.1-2-209(e).

At trial, Jonah noted that SWEPI did not take any deductions pursuant to the 2004 SWEPI letter from 2004 to 2014.  (ECF No. 134 at 214).  Furthermore, Mr. Falenski testified that from December 2014, after Ultra had acquired the SWEPI interest, Ultra took no deductions as to 30% of the royalty interests paid by SWEPI.  (ECF No. 134 at 219–21 (noting Ultra takes deductions on only a portion of the SWEPI interests)).  Jonah argues that after Ultra acquired SWEPI's working interest, burdened by Class 5, it continued "SWEPI's course of performance" and failed to deduct costs of production as defined by the WRPA with regard to some wells, but not as to others.  (ECF No. 119 at 7).

Ultra did not learn of the 2000 Amendment until late 2014 during the discovery phase of the state court litigation.  (ECF No. 1 at 13).  Therefore, it is questionable whether Ultra "with knowledge of the nature of the performance and with opportunity to object to it . . . acquiesced" and waived its right to take deductions under the 2000 Amendment.  WYO. STAT. § 34.1-1-303(a).  Furthermore, Ultra may retract its waiver, if any, through "reasonable notification" that it will no longer abide by the terms of the 2004 SWEPI letter.  WYO. STAT. § 34.1-2-209(e).  Jonah has not demonstrated that it materially changed its position in reliance on Ultra's

purported waiver of its right to deduct post-production costs pursuant to the 2000 Amendment. Accordingly, Ultra is not bound by the 2004 SWEPI letter.

*Farm-out Overrides*

During the period of 2002-2005, Shell Rocky Mountain Production, LLC ("Shell") acquired from Ultra additional working interests on acreage in the Pinedale Field under a 1996 New Fork Unit Farm-out Agreement between Meridian Oil Company ("MOC") and Burlington. (ECF No. 111–12 at 6).  As MOC's successor in interest, Shell began paying the farm-out overrides.

The farm-out overrides do not contain specific language regarding price or specific language that express provides for costs or expenses that may be deducted from the value of production.  (ECF Nos. 119 at 4; 134 at 31).  Unlike Classes 2, 3, and 4, however, the farm-out overrides were created between 2002 and 2005 from an agreement created in 1996.  (Joint Exhibit 9 at 1).  The amendments to the WRPA that set forth the definitions at issue were enacted in 1989.  Further, Hassler and Terry, as expert witnesses for Jonah and Ultra, respectively, testified that by the mid-1990s, the state of the industry was considerably different from when the contracts creating Classes 2, 3, and 4 were enacted.[21]  In 1985, the FERC issued Order 436, which allowed producers to sell directly to a third party without the need to sell through the pipeline Company.  (ECF No. 134 at 118–119, 253).  At the time MOC entered into the Farm-Out Agreement with Burlington, wellhead pricing was no longer the standard, because producers were no longer forced to sell at the well.  By the mid-1990s, Producers were free to "try to identify places where they [could] sell gas, and then enter into . . . appropriate contracts."

---

[21] In 1985, the FERC issued Order 436, which allowed producers to sell directly to a third party without the need to sell through the pipeline Company.  (ECF No. 134 at 118–119, 253).  In the 1990s, FERC Order 636 took the industry a step further and required pipelines to separate selling gas and transporting gas.

(ECF No. 134 at 255).  Wellhead pricing therefore is not an implied term underlying the farm-out overrides.  In light of the document's silence, the WRPA applies.

<u>**CONCLUSION**</u>

The Court will issue an order consistent with this Memorandum Opinion.

SIGNED <u>**December 19, 2019.**</u>

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE